UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
                  :

TIMOTHY HOWARD HIGGINS,     :
                  :

          Plaintiff,   :   17-CV-5747 (OTW)
                  :

       -against-    :   **OPINION AND ORDER**
                  :

NANCY BERRYHILL, Acting Commissioner :
of Social Security,          :
                  :

         Defendant.   :
                  :

--------------------------------------------------------------x

**ONA T. WANG, United States Magistrate Judge:**

## I.    Introduction

Plaintiff Timothy Higgins commenced this action pursuant to 42 U.S.C. § 405(g),

challenging the decision by the Acting Commissioner of Social Security (the "Commissioner")

denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("the Act"), 42 U.S.C. § 405(g). The parties have cross-moved for judgment on the

pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF 14, 18).

For the reasons set forth below, Plaintiff's motion for judgment on the pleadings is

GRANTED and Defendant's motion is DENIED.

II.      Facts

A.       Procedural Background

Plaintiff filed an application for DIB on April 20, 2012, alleging that he became disabled on December 17, 2011, due to insomnia, fibromyalgia,[1] lupus,[2] anxiety, major depression, asthma, hypertension,[3] and attention-deficit/hyperactivity disorder (ADHD). (Tr. 129, 275–76, 333). This claim was initially denied on September 11, 2012, (Tr. 129), and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 152–62). On October 4, 2013, Plaintiff appeared with an attorney representative at a hearing before ALJ Brian Lemoine. (Tr. 93–122, 206). On November 4, 2013, the ALJ issued a decision finding that Plaintiff was not disabled. (Tr. 130–45). On May 12, 2015, the Appeals Council granted Plaintiff's request for review based on newly submitted evidence, and remanded the case to the ALJ to consider that evidence. (Tr. 146–49). Plaintiff appeared with his attorney at another hearing before ALJ Lemoine on January 20, 2016. (Tr. 40–92, 267–68). On February 5, 2016, the ALJ issued a decision finding that Plaintiff was not disabled from December 17, 2011, his alleged disability onset date, through the date of the decision. (Tr. 15–39). On May 26, 2017, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. (Tr. 1–6).

---

[1] Fibromyalgia refers to "pain and stiffness in the muscles and joints that either is diffuse or has multiple trigger points." *Dorland's Illustrated Medical Dictionary* ("*Dorland's*") at 703 (32nd ed. 2012).

[2] Lupus is the "name formerly given to numerous types of localized destruction or degeneration of the skin caused by cutaneous diseases." *Dorland's* at 1079.

[3] Hypertension refers to "high arterial blood pressure." *Dorland's* at 896.

**B.      Social Background**

Plaintiff was born on November 14, 1980, and was 31 years old at his alleged disability onset date, December 17, 2011. (Tr. 29, 362). He has a high school education (Tr. 29, 362) and previously worked as a web-site owner, pool store manager, gym manager, and retail manager. (Tr. 324, 334, 362).

Plaintiff submitted a "Function Report – Adult – Form SSA-3373," to the Social Security Administration on July 20, 2012. (Tr. 309–31). Plaintiff reported that he had pain in his lower back, hips, shoulders, knees and hands, and a history of asthma. (Tr. 319, 321). Plaintiff stated that he could only lift items for a short amount of time and that repeating any one motion caused pain and weakness. (Tr. 315). Plaintiff stated he had trouble using his hands and that writing, playing the piano, and eating caused his hands to cramp. (Tr. 316). Plaintiff also stated that he limited his reaching in order to limit using his shoulders. (Tr. 316).

Plaintiff reported that standing caused him to experience lower back, hip, and knee pain. (Tr. 315). Plaintiff reported that he was unable to kneel or squat but that he could walk slowly for a short period of time. (Tr. 316). Plaintiff stated that he could only sit on a couch and that chairs, car seats, and benches caused him lower back, hip, and shoulder pain. (Tr. 316). Plaintiff stated that he used a TENS[4] Unit which was prescribed by a doctor. (Tr. 317).

---

[4] TENS refers to transcutaneous electrical nerve stimulation. *Dorland's* at 1882, 1951. "Transcutaneous electrical nerve stimulation (TENS) is a common form of noninvasive pain treatment involving use of electrical current, transmitted via electrodes places on the skin." *McGann v. Colvin*, 14-CV-1585 (KPF), 2015 WL 5098107, at *1 n.2 (S.D.N.Y. Aug. 31, 2015), *citing* Josinari M. DeSantana et al., *Effectiveness of Transcutaneous Electrical Nerve Stimulation*

Plaintiff stated that he began to have anxiety, panic, and depression at age 23. (Tr. 322). Plaintiff reported that he had weekly panic attacks where he experienced "rapid heartrate, freaking out, sweating, crying, [and] can't breathe." (Tr. 322). Plaintiff stated that he had difficulty getting along with people in authority because his depression and constant pain made him "miserable to be around." (Tr. 317). Plaintiff stated that he wanted to be alone more often, and was not as good of a conversationalist due to depression. (Tr. 315). Plaintiff stated that he had difficulty paying attention and was very forgetful because his medications affected his ability to concentrate. (Tr. 317).

Plaintiff stated that in a typical day, he did chores, such as light cleaning and could vacuum for five minutes. (Tr. 311, 313). Plaintiff also stated that he had a therapy dog, which he took care of with his mother's help. (Tr. 311). Plaintiff reported that he could mow the lawn and clean with help, drive for up to twenty minutes, go out alone, shop in stores once per week, pay bills, count change, handle a savings account, watch television, play with his dog, and visit his family regularly. (Tr. 311).

### C.  Medical Background

#### 1.  Medical Treatment Prior to Alleged Onset Date of December 17, 2011

On February 1, 2010, Plaintiff saw Dr. Lauren Vigna, M.D., a Family Practice Physician at FirstCare Medical, for substance abuse treatment. (Tr. 581–83). Plaintiff's general health was good, and he had completed rehabilitation for opiate addiction in January 2010. (Tr. 581-82).

---

for Treatment of Hyperplasia and Pain, Current Medicine Group (2008), available online at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2746624.

Dr. Vigna diagnosed Plaintiff with opioid dependence and anxiety disorder, and prescribed

suboxone, Seroquel, and Voltaren. (Tr. 582–83).

In November 2010, Plaintiff underwent a magnetic resonance imaging ("MRI") of his

cervical spine which showed diffuse degenerative changes. (Tr. 569). Radiologist Joseph

Racanelli noted:

> C4-C5: There is disc space narrowing, disc desiccation and disc degeneration.
> There is mild foraminal stenosis bilaterally . . . C5-C6: There is slight retrolisthesis
> of C5 with respect to C6. There is mild disc bulging. There is moderate foraminal
> stenosis bilaterally, left worse than the right . . . C6-C7: There are mild
> degenerative changes. There is mild foraminal stenosis on the left.

(Tr. 569). [5]

### 2.     Medical Treatment After Alleged Onset Date of December 17, 2011

#### a.     Dr. Lauren Vigna, Family Practice Physician

Plaintiff returned to Dr. Vigna on January 4, 2012 for a follow-up related to his

hypertension and shoulder pain. (Tr. 682–84). Dr. Vigna noted that Plaintiff's hypertension had

---

[5] The cervical vertebrae, denoted by symbols C1 through C7, are the upper seven vertebrae, constituting the skeleton of the neck. *Dorland's* 2051. Stenosis refers to an obstruction or a constriction. *Dorland's* at 1769.

Cervical stenosis occurs in the part of the spine in the neck and lumbar stenosis occurs in the lower back. Cervical stenosis is associated with numbness, tingling or weakness in a hand, arm, foot or leg, problems with walking and balance, and neck pain; lumbar stenosis is associated with numbness, tingling or weakness in a foot or leg, back pain and pain or cramping in one or both legs when standing or walking for long periods. *See* Spinal Stenosis, Mayo Clinic, at https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Nov. 28, 2018). Spinal stenosis is a "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space; symptoms are caused by compression of the cauda equina and include pain, paresthesias, and neurogenic claudication. The condition may be either congenital or due to spinal degeneration." *Dorland's* at 1770.

been well-controlled since Plaintiff's last visit. (Tr. 682). Plaintiff told Dr. Vigna that he was experiencing back and right shoulder pain but that he was not experiencing paresthesia[6] or muscle weakness and stated that he was taking his friend's Percocet. (Tr. 682). Dr. Vigna examined Plaintiff and found that he had a normal gait, but he had tenderness in his lumbosacral spine and decreased range of motion in his right shoulder. (Tr. 683). Dr. Vigna ordered an MRI of Plaintiff's right shoulder and referred Plaintiff to pain management. (Tr. 682). She prescribed tramadol and Daypro for pain, and valium for insomnia. (Tr. 684).

Plaintiff returned to Dr. Vigna on March 7, 2012, for substance abuse treatment. (Tr. 685–87). In a description of Plaintiff's past medical history, Dr. Vigna noted that Plaintiff had fibromyalgia. (Tr. 586). Plaintiff told Dr. Vigna that he had been off suboxone, which was used to treat Plaintiff's opioid addition, due to an insurance problem, but that he had started taking it again. (Tr. 685). Dr. Vigna noted that Plaintiff was taking antibiotics for cellulitis[7] in his left forearm. (Tr. 685). Plaintiff told Dr. Vigna that he was not experiencing any pain and reported that his general health was good. (Tr. 685). Dr. Vigna prescribed suboxone, Daypro for back pain, and recommended that Plaintiff see a neurologist for his nerve pain. (Tr. 687).

Plaintiff returned to Dr. Vigna on April 18, 2012, for substance abuse treatment. (Tr. 691–93). Plaintiff told Dr. Vigna that he was experiencing back pain and anxiety. (Tr. 692). Dr.

---

[6] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." *Dorland's* at 1383.

[7] Cellulitis is "an acute, diffuse, spreading, edematous, suppurative inflammation of the deep subcutaneous tissues and sometimes muscle, sometimes with abscess formation. It is usually caused by infection of a wound, burn, or other cutaneous lesion by bacteria[.]" *Dorland's* at 325.

Vigna noted that Plaintiff had a therapist. (Tr. 692). Dr. Vigna noted that Plaintiff's last three

drug tests were positive for cocaine. (Tr. 691). Dr. Vigna encouraged Plaintiff to see a

neurologist or rheumatologist for an actual diagnosis or confirmation of fibromyalgia. (Tr. 693).

### b.    Dr. Leila Boukhris, Internist

Plaintiff's primary treating physician Dr. Leslie Boukhris, an internist with the Hudson

Valley Health Group, LLP, started treating Plaintiff on August 10, 2012. (Tr. 562). At the first

visit, Plaintiff told Dr. Boukhris that he had fatigue, generalized pain, heart palpitations,

weakness, decreased sensation in the arms and legs, anxiety, depression and tingling in the

fingers. (Tr. 562–63). Dr. Boukhris diagnosed Plaintiff with a history of fibromyalgia and

hypertension. (Tr. 563). Plaintiff saw Dr. Boukhris again on August 28, 2012, and Dr. Boukhris

noted that Plaintiff had increased muscle pain and weakness and worsened depression. (Tr.

561). Dr. Boukhris's notes state that there were no signs of inflammation, and referred Plaintiff

to pain management. (Tr. 561). On the patient referral form, Dr. Boukhris noted that the

Plaintiff had "severe fibromyalgia," "OA [osteoarthritis] cervical spine," and "radiculopathy."[8]

(Tr. 560). Dr. Boukhris noted that it was "very possible" that Plaintiff was drug seeking. (Tr.

561).

---

[8] Radiculopathy is "disease of the nerve roots, such as from inflammation or impingement by a tumor or a bony spur." Cervical radiculopathy refers to "radiculopathy of cervical nerve roots, often with neck or shoulder pain." *Dorland's* at 1571.

Dr. Boukhris referred Plaintiff for MRIs of his lumbar[9] and thoracic[10] spine. (Tr. 567–68). Radiologist Pamela Nguyen conducted the MRIs on September 12, 2012. (Tr. 567–68). Dr. Nguyen also reviewed a November 12, 2010, MRI of Plaintiff's cervical spine. (Tr. 567–68). The 2012 MRIs showed degenerative changes at the L5-S1 level and upper thoracic levels, without significant spinal canal or neural foraminal stenosis. (Tr. 567–68). Dr. Nguyen's impression of the MRI of Plaintiff's lumbar spine stated:

> [t]ransitional anatomy at the lumbosacral junction. The last formed disc space is designated the L5-S1 disc level with a partially lumbarized S1 vertebral body . . . . Degenerative changes localized to the L5-S1 level where there is a generalized disc bulge and dorsal annular tear with narrowing of the left lateral recess.

(Tr. 567). Dr. Nguyen's impression of the MRI of Plaintiff's thoracic spine stated: "Mild degenerative changes of the upper thoracic levels." (Tr. 568).

On September 18, 2012, Plaintiff went to pain management at St. Luke's Cornwall Hospital and was seen by nurse practitioner Alice Looney. (Tr. 596). He had previously had a drug test there on September 10, 2012, which was positive for cocaine. (Tr. 596). The nurse informed Plaintiff that based on his positive test, he could not be prescribed narcotics. (Tr. 596). Nurse Looney suggested cervical epidural steroid injections and, at Plaintiff's request, provided him with the names of other pain management facilities. (Tr. 596).

---

[9] The lumbar vertebrae, denoted by symbols L1 through L5, are the five vertebrae below the thoracic vertebrae and above the sacrum. *Dorland's* at 1662, 2051.

[10] The thoracic vertebrae, denoted by symbols T1 through T2, are usually twelve in number and are situated between the cervical and the lumbar vertebrae, giving attachment to the ribs and forming part of the posterior wall of the thorax. *Dorland's* at 2051.

On September 21, 2012, Plaintiff saw Dr. Boukhris, who noted that Plaintiff was having withdrawal symptoms from opiates and was "severely depressed." (Tr. 559, 578–79, 639). Dr. Boukhris examined Plaintiff and found that he had mild swelling in both hands. (Tr. 559). Dr. Boukhris noted that Plaintiff was on a waitlist for a methadone clinic. (Tr. 578).

On October 23, 2012, Dr. Boukhris completed a "Multiple Impairment Questionnaire." (Tr. 597–604). Dr. Boukhris diagnosed Plaintiff with polyarticular joint disease, fibromyalgia, spinal disc disease, opioid dependence, and depression. (Tr. 597). In response to a question about which clinical findings support her diagnosis, Dr. Boukhris stated that they were "positive for articular findings but not for [rheumatoid arthritis] or lupus."[11] (Tr. 597–98). Dr. Boukhris also noted that MRI findings, including an MRI that was positive for spinal disease, provided diagnostic support for Plaintiff's back pain and decrease in range of motion. (Tr. 597–98). Dr. Boukhris noted that there seemed "to be a very big difference between what he describes and on findings both clinical and labs and imaging but [that] could also be fibromyalgia." (Tr. 598). Dr. Boukhris stated that Plaintiff had "constant" pain all over his body, in every joint and muscle, in his neck, spine, limbs, fingers, and toes. (Tr. 598–99). Dr. Boukhris noted that Plaintiff's medications were Mobic, Valium, suboxone, Effexor, Dilaudid, and fentanyl.

Dr. Boukhris stated that in an eight-hour workday Plaintiff could sit for up to one hour and stand or walk for up to one hour, but that approximately every hour Plaintiff would need to get up and move around for one to two hours before sitting again. (Tr. 599–600). Dr. Boukhris stated that Plaintiff could not stand or walk continuously in a work setting. (Tr. 600). She also

---

[11] Articular findings refer to findings "of or pertaining to a joint." *Dorland's* at 159.

opined that Plaintiff could occasionally lift and carry up to 10 pounds and had "moderate" limitations for grasping, using his fingers for fine manipulations, and reaching. (Tr. 600–01). Dr. Boukhris stated that Plaintiff had "significant" limitations in doing repetitive reaching, handling, fingering or lifting because Plaintiff is "very weak" and these movements are painful. (Tr. 600). She noted that Plaintiff's condition interfered with his ability to keep his neck in a constant position, such as looking at a computer screen or looking down at a desk. (Tr. 601).

Dr. Boukhris stated that Plaintiff's symptoms were so severe that they "constantly" interfered with his attention and concentration, and that he was incapable of even "low stress" work because he "is in constant severe debilitating pain [and] very emotionally fragile." (Tr. 602). Dr. Boukhris indicated that emotional factors including depression, opiate dependency, and a history of alcoholism contributed to the severity of Plaintiff's symptoms and functional limitations. (Tr. 602). She listed Plaintiff's psychological limitations and inability to push, pull, kneel, bend, or stoop as limitations that would affect Plaintiff's ability to work at a regular job on a sustained basis. (Tr. 603). Dr. Boukhris noted that Plaintiff might need to take unscheduled breaks every 30 minutes to one hour in order to rest during an eight hour working day and estimated that Plaintiff would likely be absent more than three times per month. (Tr. 602–03). Dr. Boukhris was not sure how long Plaintiff would need to rest before returning to work and was also unable to answer whether Plaintiff was a malingerer. (Tr. 602). Dr. Boukhris also stated that Plaintiff "has some back/spine problems that could explain his symptoms [but that he] seem[ed] to be more focused on receiving medication and not trying to get the necessary workup for his diagnosis." (Tr. 603).

Plaintiff returned to Dr. Boukhris on November 6, 2012, to talk to Dr. Boukhris about prescriptions he was given for pain management. (Tr. 554, 557). Plaintiff reported to Dr. Boukhris that he was on methadone and felt better most of the day, but had severe anxiety and pain at night. (Tr. 554, 557). Dr. Boukhris prescribed Flexeril and Xanax, and decreased Plaintiff's dosage of Effexor. (Tr. 557). Dr. Boukhris diagnosed depression and noted that Plaintiff's MRI came back positive for lumbar disc bulging and tear and cervical spinal stenosis. (Tr. 557). Dr. Boukhris referred Plaintiff for an orthopedic consultation. (Tr. 557).

Plaintiff returned to Dr. Boukhris on December 7, 2012, reporting memory loss, personality changes, pain, and stiffness. (Tr. 553). Dr. Boukhris noted that Plaintiff was still on methadone and was tolerating it well. (ECF 553). Dr. Boukhris scheduled Plaintiff for memory testing, an electromyography[12] ("EMG"), and a brain MRI. (Tr. 553). Cognitive testing on December 21, 2012, showed that Plaintiff's cognitive functioning was below the normal range for his education. (Tr. 574–77, 657, 659–61). Plaintiff showed high functioning in "fluency," a marked impairment in memory, and a probable impairment in executive functioning. (Tr. 576).

A January 4, 2013 MRI of Plaintiff's brain was normal. (Tr. 644, 647). A February 25, 2013, nerve conduction study and EMG of Plaintiff's arms and wrists were unremarkable. (Tr. 571–73). Electrodiagnostician Salim N. Diaz concluded that the "electrophysiological study

---

[12] An EMG is "an electrodiagnostic technique for recording the extracellular activity . . . of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation." *Dorland's* at 602, 608.

failed to reveal plexopathy,[13] radiculopathy, [and/or] peripheral neuropathy at this time" and that "clinical correlation is recommended." (Tr. 573).

Plaintiff visited Dr. Boukhris on February 28, 2013 for a follow up visit. (Tr. 550). Dr. Boukhris diagnosed Plaintiff with fibromyalgia, muscle weakness, polyarticular joint disease, hepatitis C, and lumbar spine and neck pain. (Tr. 550). Dr. Boukhris noted that despite Plaintiff's complaints, Plaintiff did not want to start physical therapy or return to rheumatology. (Tr. 548–50). Dr. Boukhris noted that Plaintiff was on Flexeril and referred Plaintiff to a neurologist. (Tr. 549).

Plaintiff returned to Dr. Boukhris on March 26, 2013, complaining of low back pain for the past four days. (Tr. 547). Dr. Boukhris noted that Plaintiff was on the maximum dose of Flexeril and that his prescription of Effexor was increased. Dr. Boukhris noted that she could not prescribe narcotics because Plaintiff was on methodone but suggested that Plaintiff get a back brace and take ibuprofen. (Tr. 547).

In a form letter dated March 26, 2013 addressed to "Whom It May Concern," Dr. Boukhris indicated that drug and/or alcohol use was not a "material cause" of Plaintiff's disability by checking a box stating that "My patient is currently not using drugs and/or alcohol and remains disabled." (Tr. 580).

Plaintiff returned to Dr. Boukhris on May 17, 2013. (Tr. 625). Plaintiff stated that he had increased fatigue, drowsiness, back pain, and depressive symptoms. (Tr. 625). Dr. Boukhris

---

[13] Plexopathy refers to "any disorder of a plexus, especially of nerves." A plexus is "a network of lymphatic vessels, nerves, or veins." *Dorland's* at 1462.

noted that Plaintiff's hands were swollen. (Tr. 625). Dr. Boukhris noted that Plaintiff's weight had increased due to methadone and that he was experiencing fatigue and trouble sleeping. Dr. Boukhris noted that Plaintiff was prescribed Effexor and Xanax and prescribed Lisinopril to treat Plaintiff's high blood pressure. (Tr. 625).

Plaintiff returned to Dr. Boukhris on June 7, 2013. (Tr. 624). Plaintiff told Dr. Boukhris that he had a rash on his left leg for the past three days. (Tr. 624). Dr. Boukhris also noted that Plaintiff had decreased muscle strength in all extremities. (Tr. 624).

Plaintiff returned to Dr. Boukhris on June 27, 2013, for a follow-up visit. (Tr. 622). Dr. Boukhris examined Plaintiff and found that he had severe generalized pain, decreased range of motion in his extremities, and increased anxiety. (Tr. 622). Dr. Boukhris diagnosed fibromyalgia, generalized pain, decreased dexterity and mobility, severe anxiety, and excessive sweating. (Tr. 622). Dr. Boukhris also noted that Plaintiff was agitated. (Tr. 622). Dr. Boukhris discontinued Plaintiff's prescription of Xanax and gave Plaintiff a prescription for Valium. (Tr. 622). Dr. Boukhris noted that Plaintiff was still on methadone and was on a high dose of Effexor. (Tr. 622).

Plaintiff returned to Dr. Boukhris on August 9, 2013, for his pain and depression. (Tr. 623). Dr. Boukhris noted that Plaintiff had tachycardia[14] and discontinued Plaintiff's prescription of Effexor and prescribed Savella instead. (Tr. 623). Dr. Boukhris also prescribed metoprolol.

---

[14] Tachycardia refers to "excessive rapidity in the action of the heart; the term is usually applied to a heart rate above 100 beats per minute in an adult." *Dorland's* at 1867.

Plaintiff returned to Dr. Boukhris on September 20, 2013. (Tr. 709–11, 793, 795). Dr. Boukhris diagnosed Plaintiff with fibromyalgia with severe muscle aches, pain, and stiffness and difficulty walking and sitting. (Tr. 709). Plaintiff informed Dr. Boukhris that he stopped taking Savella because it worsened his back pain and made him sweat more. (Tr. 709). Plaintiff reported that he continued to take Effexor but at a lower dose. (Tr. 709). Plaintiff stated that Flexeril and Effexor helped with his muscle pain and stiffness. (Tr. 709). Dr. Boukhris also diagnosed Plaintiff with severe anxiety, but noted that Plaintiff's anxiety responded to Xanax and Valium. (Tr. 710). Dr. Boukhris diagnosed Plaintiff with short term memory loss and noted that a memory test confirmed Plaintiff's memory loss, which was related to his depression. (Tr. 710). Dr. Boukhris also diagnosed Plaintiff with tachycardia and hypersomnia and noted that Plaintiff was taking metoprolol. (Tr. 710–11). Dr. Boukhris noted that Plaintiff would not see the gastroenterologist she recommended before doing his own research about which gastroenterologist to see, and had not yet seen a neurologist but asked to have an MRI. (Tr. 710). Dr. Boukhris prescribed Ativastin to treat Plaintiff's high cholesterol and noted that he was still on methadone. (Tr. 710).

In a letter signed and dated on September 20, 2013, addressed to "To Whom It May Concern," Dr. Boukhris stated that Plaintiff had difficulty walking and standing for long periods due to fibromyalgia and chronic back pain, had depression and short-term memory loss, and was unable to maintain a full-time job due to his medical problems. (Tr. 678).

Plaintiff returned to Dr. Boukhris on November 26, 2013. (Tr. 708). Dr. Boukhris diagnosed Plaintiff with hepatitis C, severe fibromyalgia "not responding to any prescribed meds," tachycardia, depression, anxiety, and short term memory loss. (Tr. 708). Dr. Boukhris

also noted that an MRI of Plaintiff's lumbar spine showed disc bulging. (Tr. 708). Dr. Boukhris ordered an MRI of Plaintiff's cervical spine. (Tr. 707–08). On December 9, 2013, Dr. Robert Greco conducted an MRI on Plaintiff's cervical spine. (Tr. 703). Dr. Greco's impression of the MRI was: "At the C4-5 and C5-6 levels there is disc bulging resulting in deformity of the thecal sac without spinal stenosis." (Tr. 703).

In an undated letter addressed "to whom it may concern,"[15] Dr. Boukhris stated that Plaintiff had a debilitating form of fibromyalgia, which restricted his daily functional abilities since he was in severe chronic pain. (Tr. 715). Dr. Boukhris also stated that Plaintiff had degenerative joint disease[16] of the cervical and lumbar spine with chronic lower and upper extremity radiculopathy, and depression. (Tr. 715). Dr. Boukhris stated that Plaintiff was being followed by a neurologist and was also receiving treatment for his depression. (Tr. 715). Dr. Boukhris stated that due to Plaintiff's chronic pain, he had difficulty maintaining any position for long periods of time. (Tr. 715).

Plaintiff returned to Dr. Boukhris on December 30, 2013. (Tr. 706). Dr. Boukhris noted that Plaintiff stated that he was looking for a new rheumatologist because he did not want to return to Dr. Koshnof Antar. (Tr. 706). Dr. Boukhris remarked that Plaintiff's tachycardia was

---

[15] The document appears to have been sent by fax on December 23, 2013. (Tr. 715). Plaintiff's attorneys provided this letter to the Appeals Council on December 30, 2013. (Tr.714).

[16] Osteoarthritis, also known as degenerative joint disease, is "a noninflammatory degenerative joint disease seen mainly in older persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial membrane. It is accompanied by pain, usually after prolonged activity, and stiffness, particularly in the morning or with inactivity." *Dorland's* at 1344.

most likely related to his medication Effexor and Vyvanse. (Tr. 706). Dr. Boukhris noted that Plaintiff was on omeprazole.

On March 25, 2014, Plaintiff saw Dr. Boukhris and reported increased sweating and Dr. Boukhris noted that this may be related to Plaintiff's prescriptions for Effexor, methadone and Vyvanse. (Tr. 752). On May 20, 2014, Dr. Boukhris noted that Plaintiff was still on methadone and that he would benefit from physical therapy or aquatherapy. (Tr. 751).

### c. Dr. Koshnof Antar, Rheumatologist

Plaintiff saw rheumatologist Dr. Koshnof Antar on September 21, 2012. (Tr. 542–46). Dr. Antar noted that Plaintiff reported that he had polyarticular joint pain, and slight diffuse musculoskeletal pain for the past five years, particularly involving his shoulder. (Tr. 542). Dr. Antar noted that both of Plaintiff's hands were swollen. (Tr. 542). Plaintiff complained of neck and lower back pain without persistent weakness or numbness. (Tr. 542). Dr. Antar examined Plaintiff and found that Plaintiff had a "satisfactory" range of motion in the cervical spine, shoulders, elbows, hips, knees, ankles and toes, without erythema, ecchymosis or synovitis in these areas. (Tr. 542). However, Dr. Antar found that Plaintiff had "tenderness in both of his wrists, MCP (metacarpophalangeal joints), PIP (proximal interphalangeal joints), and DIP (distal interphalangeal joints) with swelling." (Tr. 542). Dr. Antar sent Plaintiff for x-rays of both of his hands and wrists. (Tr. 542). Dr. Antar stated that Plaintiff's "[d]iffuse nonlocalized musculoskeletal pain [was] suggestive of fibromyalgia which could be secondary to his underlying inflammatory arthritis disease," and asked Plaintiff to follow up in two to four weeks. (Tr. 543).

#### d.      Dr. Syed Nasir, Neurologist

Dr. Boukhris referred Plaintiff to neurologist Dr. Syed Nasir in February 2013. (Tr. 549).

On March 13, 2013, Plaintiff presented to Dr. Nasir with complaints of numbness in both hands

and neck pain. (Tr. 735). Plaintiff told Dr. Nasir that his pain was moderate to severe but stated

that he was not experiencing weakness. (Tr. 735). Dr. Nasir examined Plaintiff and found that

Plaintiff had full muscle strength bilaterally, and that his gait, station, and lower extremities

were normal. (Tr. 735). Dr. Nasir diagnosed chronic pain syndrome and memory loss, and

increased Plaintiff's dosage of Effexor. (Tr. 735).

Plaintiff returned to Dr. Nasir on March 11, 2014, complaining of muscle weakness. (Tr.

737–38). Dr. Nasir noted that Plaintiff had full motor strength, and a normal gait and station.

(Tr. 737–38). Dr. Nasir diagnosed chronic pain syndrome and memory loss and continued

Plaintiff on Effexor. (Tr. 737–38).

Plaintiff returned to Dr. Nasir on December 1, 2014, again for muscle weakness. (Tr.

739–41). Plaintiff reported numbness in both hands, neck pain, and severe pain in his lower

back upon bending. (Tr. 740). Dr. Nasir examined Plaintiff and found that he had normal gait,

full motor strength, and normal sensation. (Tr. 740). Dr. Nasir diagnosed chronic pain syndrome

and memory loss. (Tr. 740). Dr. Nasir discontinued Plaintiff's prescription of Flexeril, continued

his prescription of venlafaxine, and increased Plaintiff's prescription of Zanaflex. (Tr. 741). He

noted that Plaintiff's reported pain was inconsistent with the diagnostic reports. (Tr. 741). Dr.

Nasir referred Plaintiff to pain management, and suggested that Plaintiff consider trigger point[17] injections. (Tr. 741).

### e.      Dr. Joseph George, Cardiologist

On September 19, 2013, Plaintiff saw cardiologist Dr. Joseph George for an evaluation of resting tachycardia. (Tr. 813–14). Plaintiff reported that he went on walks with his dog at a leisurely pace. (Tr. 813). Plaintiff reported stiffness and pain in his low back, which affected his ability to walk. (Tr. 813). Dr. George noted that Plaintiff was calm, relaxed, alert, oriented, and not in acute distress, and had a normal gait and station. (Tr. 813–14). Dr. George ordered an echocardiogram, and continued Plaintiff's prescriptions for Toprol and Xanax. (Tr. 813–14).

Plaintiff returned to Dr. George on November 21, 2013, with chronic cervical and thoracic spine pain and generalized weakness, malaise, and chronic heartburn and low back pain. (Tr. 811–12). Plaintiff told Dr. George that he took his dog on hour-long slow walks on a daily basis. (Tr. 811–12). Dr. George examined Plaintiff and found that Plaintiff's gait and station were normal. (Tr. 811). Dr. George noted that Plaintiff did not appear to be in acute distress. (Tr. 811). Dr. George noted that Plaintiff had unexplained sinus tachycardia,[18] and ordered an echocardiogram. (Tr. 811).

Plaintiff again saw Dr. George on December 12, 2013, for continued muscular aches and weakness, and lower back pain. (Tr. 809–10; *see* Tr. 800, 815–16). Dr. George examined Plaintiff

---

[17] A trigger point is "a point on a muscle, ligament, tendon or area of fascia that when touched causes referred pain." *Dorland's* at 1480.

[18] Sinus tachycardia is "tachycardia originating in the sinus node; it is normal during exercise or anxiety and occurs abnormally associated with shock, hypotension, hypoxia, congestive heart failure, fever, and various high output states. *Dorland's* at 1867.

and found that Plaintiff was calm, relaxed, and not in acute distress, and that his gait and station were normal. (Tr. 809). Dr. George diagnosed Plaintiff with fibromyalgia and noted that there was no evidence of structural cardiac disease. (Tr. 809). Dr. George continued Plaintiff's prescriptions for Toprol, Xanax, and methadone. (Tr. 809).

Plaintiff returned to Dr. George on December 18, 2014, for his one-year follow up appointment. (Tr. 807–08). Plaintiff told Dr. George that he continued to walk his dog on a daily basis without experiencing unusual shortness of breath or chest pain. (Tr. 807–08). Plaintiff told Dr. George that he had intermittent neck pain, and mid back pain for which he was seeing a chiropractor. (Tr. 807). Plaintiff told Dr. George that he had not recently experienced palpitations. (Tr. 807). Dr. George noted that Plaintiff was calm, relaxed, and not in acute distress, and he had normal gait. (Tr. 807). Dr. George continued Plaintiff's prescriptions for Toprol, Effexor, methadone, an antihistamine, omeprazole and Flexeril. (Tr. 807).

Plaintiff saw Dr. George on April 13, 2015, for treatment of chest pain. (Tr. 804–05; *see* Tr. 817–18 (echocardiography)). Plaintiff told Dr. George that he was in a car accident on February 20, 2015, where he was struck by the steering wheel, and the airbag deployed striking his chest. (Tr. 804). Plaintiff told Dr. George that he had anterior chest pain which worsened upon bending or extending his arms. (Tr. 804). Dr. George found that Plaintiff did not appear to be in distress, and had a normal gait. (Tr. 804). Dr. George stated that Plaintiff's musculoskeletal chest pain was "probably" post-trauma, but that he did not think that Plaintiff's "mild peripheral edema, and chest congestion" were cardiac-related. (Tr. 804). Dr. George ordered a chest x-ray and continued Plaintiff's prescriptions of Xanax, Toprol, Effexor, methadone,

omeprazole, Flexeril, Lasix, and an antihistamine. (Tr. 804-05). Dr. Joseph Racanelli performed

Plaintiff's chest x-ray on April 17, 2015 and noted that the x-ray results were normal. (Tr. 841)

### f. Dr. Michael Cho, Neurosurgeon

On November 7, 2013, Plaintiff saw neurosurgeon Dr. Michael Cho for his low back pain.

(Tr. 699–700). Dr. Cho examined Plaintiff and found that his coordination, motor strength, and

reflexes were normal. (Tr. 700). Dr. Cho noted that Plaintiff's current medications were

methadone, Flexeril, Xanax, Vyvanse, metoprolol, and Effexor. (Tr. 699). Dr. Cho diagnosed

degeneration of cervical intervertebral disc and degeneration of lumbar or lumbosacral disc.

(Tr. 700). Dr. Cho stated that there was no need for surgery, but opined that Plaintiff was

"totally and permanently disabled at this point" due to the "complete failure of conservative

care" and "the level of pain." (Tr. 700).

### g. Dr. Mary Dyer, Family Practice Physician

In November 2014, Dr. Mary Dyer, a family practice physician, referred Plaintiff to

Hudson Valley Imaging for x-rays of his lumbar, thoracic, and cervical spine. (Tr. 731–33).

Radiologist, Lawrence Cicchiello conducted and reviewed the x-rays on November 5, 2014. (Tr.

731–33). The x-ray of Plaintiff's lumbar spine showed degenerative disc disease[19] of the lower

---

[19] New York University's Langone Medical Center defines degenerative disc disease as a "condition [that] causes the spongy layers of cartilage that cushion the bones of the spine to deteriorate, often as a natural part of aging. Over time, changes in the size and resiliency of the discs can cause persistent, aching pain in the back or neck and may make everyday movements difficult." "Degenerative Disc Disease in Adults," *available at* http://nyulangone.org/conditions/degenerative-disc-disease-in-adults (last visited Nov. 28, 2018); *see also* Cedars-Sinai, "Degenerative Disc Disease," https://www.cedars-sinai.org/health-library/diseases-and-conditions/d/degenerative-disc-disease.html (last visited Nov. 28, 2018).

lumbar spine, grade 1 retrolisthesis[20] at L4-L5, and scoliosis. (Tr. 731). Dr. Cicchiello noted that

the anteroposterior ("AP") view was limited due to "underpenetration secondary to [Plaintiff's]

body habitus." (Tr. 731). X-rays of Plaintiff's thoracic spine showed mild multilevel degenerative

disc disease. (Tr. 732). Dr. Cicchiello noted that the evaluation of Plaintiff's lower thoracic spine

was also limited on the AP view due to "underpenetration." (Tr. 732). The x-ray of Plaintiff's

cervical spine showed that he had degenerative disc disease at C4-C5 and C5-C6. (Tr. 733).

In a letter dated March 13, 2015 addressed "To whom it may concern," Dr. Dyer advised

that Plaintiff was under her care, and that he was totally and permanently disabled due to

chronic lower back pain, chronic neck pain with radiculitis from spinal stenosis, chronic anxiety

and depression, and chronic plantar fasciitis. (Tr. 742). Dr. Dyer noted that "for the last 5 years

[Plaintiff had] made little to no progress in his physical condition" and that she observed that it

"is an effort for him to tolerate even the hour or so he spends sitting/standing/walking at [her]

office for an appointment." (Tr. 742). Dr. Dyer stated that Plaintiff had gained weight, that his

medications could cause decreased attention span, and that she doubted that Plaintiff could

perform part-time, sedentary work. (Tr. 742).

Dr. Dyer ordered an MRI and x-ray of Plaintiff's cervical spine (Tr. 757, 769–71), an x-ray

of Plaintiff's thoracic spine (Tr. 756, 774), and an MRI and x-ray of Plaintiff's lumbar spine in July

2015. (Tr. 772, 775). Dr. Joseph Racanelli noted that Plaintiff's x-ray of his cervical spine showed

degenerative changes. (Tr. 769). There was a scoliotic curvature, diffuse disc space narrowing,

---

[20] Retrolisthesis, also called retrospondylolisthesis, refers to "posterior displacement of one
vertebral body on the subjacent body." *Dorland's* at 1636.

osteophytosis,[21] and foraminal stenosis on the left at C5-C6 and C6-C7. (Tr. 769). The report also showed that there was "severe foraminal stenosis bilaterally" at the C5-C6 level. (Tr. 770-71).

On July 13, 2015, Dr. Racanelli conducted and reviewed the x-ray of Plaintiff's thoracic spine and found scoliotic curvature and degenerative changes. (Tr. 774).

Dr. Racanelli conducted and reviewed the MRI and x-ray of Plaintiff's lumbar spine in July 2015. (Tr. 772, 775). Dr. Racanelli stated that Plaintiff's MRI of his lumbar spine showed degenerative changes at L5-S1 without significant change since Plaintiff's May 2014 imaging. (Tr. 772; *see* Tr. 756, 774–75 (x-ray showing degenerative changes)). Dr. Racanelli stated that the x-ray of Plaintiff's lumbar spine showed degenerative changes. (Tr. 775). Specifically, Dr. Racanelli found a scoliotic curvature, diffuse disc space narrowing, osteophytosis, and retrolisthesis at L4-L5. (Tr. 775).

Plaintiff returned to Dr. Dyer on July 23, 2015. (Tr. 856). There are no treatment notes from the visit, but it is noted that Dr. Dyer prescribed Biaxin, an antibiotic, for thirty days. (Tr. 856). Dr. Dyer also listed Plaintiff's current medications as: Biaxin, triamcinolone, nystatin, Wellbutrin, Effexor, Lasix, Neurontin, Advair, albuterol, lidocaine-prilocaine, glycopyrolate, Xanax, omeprazole, Flonase, methadone, metoprolol, Lipitor and Drisdol. (Tr. 856).

On August 23, 2015, Dr. Dyer discontinued Plaintiff's prescriptions for cyclobenzaprine and alprazolam, and prescribed Valium and Soma. (Tr. 855). On September 18, 2015, Plaintiff

---

[21] Osteophytosis is "a condition characterized by the formation of osteophytes." An osteophyte is "a bony excrescence or osseous outgrowth." *Dorland's* at 1348.

returned to Dr. Dyer for a follow-up, but there are no corresponding treatment notes; rather Dr. Dyer noted that Plaintiff's medications were nystatin, Tab-A-Vite, Lovaza, Wellbutrin, Victoza, Effexor, Lasix, Neurontin, Advair, albuterol, lidocaine-prilocaine, glycopyrrolate, omeprazole, Flonase, methadone, metoprolol, and Lipitor. (Tr. 853). On October 15, 2015, Plaintiff saw Dr. Dyer for his follow-up visit and Dr. Dyer noted that Plaintiff was scheduled for a sleep study. (Tr. 851). Dr. Dyer noted that Plaintiff's medications were glycopyrrolate, Victoza, nystatin, Tab-A-Vite, Lovaza, Wellbutrin, EfFexor, Lasix, Neurontin, Advair, albuterol, lidocaine-prilocaine, omeprazole, Flonase, methadone, metoprolol, and Lipitor. (Tr. 851).

On November 13, 2015, Plaintiff returned to Dr. Dyer for treatment of a rash around his neck and "rash/'jock itch'" caused by medication. (Tr. 850). Dr. Dyer prescribed Diflucan, fluocinonide cream, Ceftin, and Deplin. (Tr. 850). Plaintiff returned to Dr. Dyer on December 8, 2015, for treatment of a sinus infection. (Tr. 849). Plaintiff told Dr. Dyer that he wanted surgery for lipomas (fatty lumps under the skin). (Tr. 849). Dr. Dyer noted that Plaintiff's medications were Victoza, clycopyrrolate, Tab-A-Vite, Lovaza, Wellbutrin, Effexor, Lasix, Neurontin, Advair, albuterol, omeprazole, Flonase, methadone, metoprolol, and Lipitor. Dr. Dyer prescribed trazodone, Ceftin and Diflucan, and discontinued Plaintiff's prescriptions of Soma, Adderall, and testosterone. (Tr. 849). Dr. Dyer diagnosed Plaintiff with chronic sinusitis. (Tr. 849).

In a letter dated January 14, 2016, addressed to "To whom it may concern," Dr. Dyer stated that Plaintiff "has several diagnoses which in total render him as totally and permanently disabled." (Tr. 866). She stated that Plaintiff suffers from major recurrent depressive disorder and panic disorder and that although these are treated with medication, symptoms persist. (Tr. 866). Dr. Dyer also stated that Plaintiff has a memory impairment possibly due to depression,

medication side effects, chronic insomnia or chronic pain. (Tr. 866). She stated that Plaintiff

"has been shown to have severe foraminal stenosis of the cervical spine on MRI which causes

constant shoulder pain and decreased function of his hands." (Tr. 866). Dr. Dyer noted that due

to this, Plaintiff is unable to use a computer or phone for any more than a short amount of

time. (Tr. 866). Dr. Dyer wrote that Plaintiff also has persistent and disabling back pain and that

"imaging shows spondylolisthesis and lumbar disk disease at several levels" which limits his

ability to stand, sit or walk for any prolonged time. (Tr. 866). Dr. Dyer stated that Plaintiff is

unable to bend down or kneel. (Tr. 866). She also stated that Plaintiff's immune function is

suppressed and that he suffers from recurrent infection, particularly chronic sinusitis. (Tr. 866).

She also stated that Plaintiff could walk for only short periods due to constant pain from his

chronic plantar fasciitis. (Tr. 866). Dr. Dyer wrote that several treatments have been

unsuccessful. (Tr. 866).

### 3. State Agency and Consultative Examiner Reports

#### a. Dr. Ralph Alvarez, Internist

Dr. Ralph Alvarez, an internist, examined Plaintiff on September 4, 2012, at the request

of the Division of Disability Determination. (Tr. 509–13). It is not clear from the record what

medical records or diagnostic reports, if any, Dr. Alvarez reviewed before examining Plaintiff or

preparing a written opinion. (Tr. 509). Dr. Alvarez noted that Plaintiff stated that he had a

"history of chronic pain secondary to fibromyalgia and/or lupus." (Tr. 509). Dr. Alvarez noted

that Plaintiff "had an MRI of his neck which showed C3 to C6 disease," and that lupus caused

swelling in Plaintiff's hands, which was more severe on certain days. (Tr. 509). Dr. Alvarez also

noted that Plaintiff's current medications were fentanyl patches, Dilaudid, Effexor, Valium, metoprolol, and an albuterol inhaler. (509-510).

Plaintiff told Dr. Alvarez that his main problem was chronic pain. Plaintiff rated the pain in his hands, neck, back, and hip as ranging from a 4 out of 10 to 10 out of 10 "depending on the type of day." (Tr. 509). Dr. Alvarez noted that Plaintiff's chronic pain caused him anxiety, depression, and insomnia. (Tr. 509). Dr. Alvarez noted that Plaintiff's lupus sometimes caused rashes and joint discomfort, especially in his hands. (Tr. 509). Dr. Alvarez noted that Plaintiff's asthma was controlled with medication and that his psychiatric condition was somewhat controlled with medication. (Tr. 509). Dr. Alvarez noted that Plaintiff "currently sees pain management." (Tr. 509). Plaintiff told Dr. Alvarez that he last worked in December 2011 where he managed a spa and pool company, "but there was just too much pain secondary to the fibromyalgia, and he [Plaintiff] could not hold a pen." (Tr. 509).

Plaintiff told Dr. Alvarez that he cooked, cleaned, and did laundry periodically but required help. (Tr. 510). Plaintiff told Dr. Alvarez that he showered, bathed, and dressed himself, and his hobbies included watching television, listening to the radio, reading, going to appointments, and socializing with friends. (Tr. 510). Plaintiff told Dr. Alvarez that he could no longer play the piano and sing. (Tr. 510). Plaintiff also told Dr. Alvarez that he could only do light work. (Tr. 510). Plaintiff told Dr. Alvarez that he was currently living with a friend. (Tr. 510).

Dr. Alvarez examined Plaintiff and found that Plaintiff was not in acute distress, maintained good eye contact, and appeared oriented. (Tr. 511–12). Dr. Alvarez noted that Plaintiff had a normal affect, judgment, and memory, but appeared somewhat depressed. (Tr.

511–12). Dr. Alvarez found that Plaintiff had a normal gait and stance, did not use an assistive device, and could partially squat and walk on his heels and toes. (Tr. 511). Dr. Alvarez noted that Plaintiff did not need help changing for the exam or getting on or off the exam table, and that Plaintiff rose from a chair without difficulty. (Tr. 511).

Dr. Alvarez found that Plaintiff had decreased range of motion in his lumbar and cervical spine, but that straight leg raising tests[22] were negative bilaterally. (Tr. 512). Dr. Alvarez noted that Plaintiff's lumbar and cervical spine showed decreased range of motion. (Tr. 511-12). Dr. Alvarez found that Plaintiff had full range of motion in his shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally, and stable and non-tender joints, "except for redness and swelling of the dorsal aspects of both hands secondary to lupus." (Tr. 512). Dr. Alvarez noted that Plaintiff had six trigger points; four trigger points involved Plaintiff's bilateral trapezius areas and two involved his bilateral gluteal areas. (Tr. 512). Dr. Alvarez found that Plaintiff had normal deep tendon reflexes and full strength without muscle atrophy in his upper and lower extremities. (Tr. 512). Dr. Alvarez also noted that Plaintiff's hand and finger dexterity was intact, with full grip strength bilaterally. (Tr. 512). Dr. Alvarez found that Plaintiff had "diffuse swelling and redness of the knuckles, dorsal aspects of both hands." (Tr. 512).

---

[22] A straight leg-raising test is a test in which the patient lies supine and "the symptomatic leg is lifted is lifted with the knee fully extended; pain in the lower extremity between 30 and 90 degrees of elevation indicates lumbar radiculopathy, with the distribution of the pain indicating the nerve root involved." *Dorland's* at 1900.

Dr. Alvarez diagnosed Plaintiff with "fibromyalgia and polymyalgia rheumatica,"[23] "Systemic lupus erythematosus," hypertension, anxiety, depression, insomnia, and a history of asthma. (Tr. 512–13). Dr. Alvarez found that Plaintiff had mild to moderate restrictions for bending, lifting, carrying, squatting, and turning his neck "due to a history of fibromyalgia, polymyalgia rheumatica, and lupus erythematosus." (Tr. 513). Dr. Alvarez also stated that Plaintiff should avoid smoke, dust, and known respiratory irritants due to his history of asthma. (Tr. 513).

### b.  Dr. Leslie Helprin, Psychologist

On September 4, 2012, Plaintiff was evaluated by consulting psychologist Dr. Leslie Helprin. (Tr. 514–18). Dr. Helprin noted that Plaintiff saw a private psychiatrist from 2008 to 2009, but that he was not currently in treatment. (Tr. 514). Plaintiff reported that he had some frustration, depression, and anger, that he had short-term memory and concentration difficulties, and difficulty sleeping at night due to pain. (Tr. 514–15). Plaintiff told Dr. Helprin that he had anxiety and hyperventilation with difficulty relaxing. (Tr. 514). Plaintiff told Dr. Helprin that he was able to dress, bathe, and groom himself as well as cook and prepare food. (Tr. 514, 516). Dr. Helprin noted that Plaintiff stated that he was able to do some sweeping and wipe the counters, but was limited in his cleaning due to pain and that he could not bend. (Tr. 514, 516). Plaintiff told Dr. Helprin that he knew how to do laundry and food shopping, but was sometimes limited by pain. (Tr. 514, 516). Plaintiff told Dr. Helprin that he was able to manage

---

[23] Polymyalgia rheumatica is "a syndrome in the elderly characterized by proximal joint and muscle pain." *Dorland's* at 1490.

his own money and drive. (Tr. 514, 516). Plaintiff told Dr. Helprin that he socialized with friends and had "good" family relationships, but that he limited his interactions due to his pain. (Tr. 514, 516). Plaintiff stated that he generally spent his days watching television, listening to music, doing chores, and attending doctor visits. (Tr. 514).

Dr. Helprin examined Plaintiff and found that he was cooperative and had normal posture and motor behavior, dysthymic mood (indicating chronic depression), depressed affect, fluent and clear speech, adequate expressive and receptive language skills, coherent and goal-directed thought processes, and intact attention and concentration. (Tr. 515–16). Dr. Helprin noted that Plaintiff's memory was mildly impaired, as he recalled three out of three objects immediately but none after a five-minute delay, and repeated six digits forward and three digits backward. (Tr. 516). Dr. Helprin noted that Plaintiff had average intellect, an appropriate general fund of information, and good insight and judgment. (Tr. 516).

Dr. Helprin diagnosed adjustment disorder with mixed anxiety and depressed mood, and alcohol abuse, in full sustained remission. (Tr. 517). Dr. Helprin opined that Plaintiff could follow and understand simple directions and instructions, perform complex tasks independently, maintain attention, concentration, maintain a regular schedule, make appropriate decisions, relate adequately with others, and deal appropriately with stress. (Tr. 516). Dr. Helprin recommended that Plaintiff seek psychiatric intervention for better psychotropic medication management, and undergo a medical evaluation to determine if his medical conditions precluded him from all work. (Tr. 517).

c.     **Echevarria, J., Psychiatry**

The record contains a document titled "Psychiatric Review Technique" signed by an individual with the name "Echevarria, J., Psychiatry" and dated September 10, 2012. (Tr. 519–31). It is unclear what documents this individual reviewed before coming to a conclusion, but the form states that the evaluation is from April 20, 2012 to the present. (Tr. 519). Echevarria found that Plaintiff's "Disorder" was "Alcohol abuse, in full sustained remission" and that Plaintiff's psychiatric impairment was not severe. (Tr. 527, 531).

D.     **Non-Medical Evidence**

1.     **First Hearing: October 4, 2013**

At the October 2013 hearing, Plaintiff testified that he graduated from high school and that he stopped working at a pool supply company in December 2011. (Tr. 97–100). Plaintiff testified that he had difficulty concentrating at work and that as a result, he made "bad decisions" that cost his employer money, including hiring employees that stole from the company, after which Plaintiff and his employer agreed that he should leave. (Tr. 99–100). Plaintiff testified that he was always "very, very, very depressed." (Tr. 101). Plaintiff also reported that his days were "very, very short" and that he was only awake for an average of seven hours a day. (Tr. 102). Plaintiff stated that he lived with his parents. (Tr. 93).

Plaintiff stated that "walking isn't that bad," provided that he walked on pavement, and that he could walk his dog for a half hour. (Tr. 103). Plaintiff accompanied his brother while he went fishing the day before the hearing. (Tr. 102). Plaintiff stated that he had very few "good days" but that on one of his recent "good days" he walked around a flea market with his

mother for an hour and a half. (Tr. 103). However, Plaintiff also testified that whenever he walked his dog or accompanied his mom on an outing he "always tire[d] [him]self out and crash[ed] without noticing it." (Tr. 103). He also reported recently going to the movies with a friend without difficulty because the theater's seats were comfortable and he "was prepared." (Tr. 113). Plaintiff testified that he could not do a whole shopping trip on his own and that he tried not to go anywhere by himself, but that he could do things around town such as "get gas real quick" because he lived in a very small town. (Tr. 107). Plaintiff testified that he was unable to do the dishes but could do some light cleaning such as dusting and wiping off his table and nightstand. (Tr. 107). Plaintiff also testified that he cleaned his cat's litterbox with some discomfort. (Tr. 107–08). Plaintiff testified that he could drive, but not on highways due to anxiety. (Tr. 108). Plaintiff testified that he did not take some of his medications when he knew he was going to drive because they make him groggy and might make him fall asleep. (Tr. 108–09).

Plaintiff stated that he could remain seated for a "long time" as long as his chair was comfortable; however, if he was using his hands while sitting, he could only sit for 20 minutes. (Tr. 104). Plaintiff testified that he was wearing a back brace at the hearing, which he tried to wear every day. (Tr. 105). Plaintiff stated that he experienced difficulty with repetitive lifting. (Tr. 105–06).

Plaintiff also testified that he had difficulty with "very, very poor memory," depression, and pain, (Tr. 101–03), and a history of alcohol and opioid dependence. (Tr. 113–14).

### 2. Second Hearing: January 20, 2016

#### a. Plaintiff's Testimony

Plaintiff testified in his second hearing on January 20, 2016. (Tr. 42–72). During the hearing Plaintiff's eyes were shut because he did not take some of his medications in order to be coherent. (Tr. 47). The ALJ noted that Plaintiff "appear[ed] to be somewhat somnolent" and "sleepy in appearance," (Tr. 49) and throughout the hearing Plaintiff had a difficult time with his memory and focus. (*See e.g.,* Tr. 10, 61, 65-66).

Plaintiff testified that he left his last pool manager job in 2011 after taking an illegal drug that had been provided by a "friend," (Tr. 59) but had no recollection of using illegal drugs or drugs that were not prescribed to him since December 17, 2011, his onset date of disability. (Tr. 61).[24] Plaintiff testified that he experienced fatigue, short-term memory loss, shoulder and back pain, and extreme foot pain, which came and went. (Tr. 62–65). Plaintiff stated that he was always in pain and that he experienced the most pain in the area wrapping around from his mid-back to his abdomen and from his mid-shoulder area to his front sternum. (Tr. 62–63). Plaintiff testified that he had gained 80 pounds since the time he had last worked and was 280 pounds at the time of the hearing. (Tr. 64–65). Plaintiff stated that his primary care doctor was Dr. Mary Dyer, and that Dr. Dyer had sent him to several specialists including, most recently, a dermatologist. (Tr. 66). Plaintiff stated that he was also receiving medical care from a cardiologist, neurologist, and a gastroenterologist for treatment of hepatitis C. (Tr. 66). Plaintiff

---

[24] In response to the ALJ's questioning, Plaintiff testified that he had "no reason to believe" that he had used illegal drugs since his onset date but that "wish[ed that his] mother was in here to remember everything because I don't." (Tr. 61).

also testified that he saw a Dr. Meredith Branch and that he spoke with his substance abuse counselor twice a week. (Tr. 67).

Plaintiff testified that he lived with his parents. (Tr. 50). Plaintiff stated that he helped out around the house as best as he could, and was able to "do a little dusting" and "wipe a couple counters a little bit." (Tr. 68). Plaintiff testified that he was no longer able to empty the dishwasher, that he was unable to cook, and that his parents did his laundry and cooked for him. (Tr. 68). Plaintiff testified that although his parents usually drove him to his appointments, in an "absolute emergency" he would skip his medications and drive himself. (Tr. 69). Plaintiff stated that he collected antique books and that he kept in touch with a few friends, but not on a regular basis and he did not see them "face to face." (Tr. 69–70). Plaintiff testified that he no longer had his therapy dog. (Tr. 70).

Plaintiff testified that he continued to take his medications even though they do not eliminate his extreme pain because they do have some "beneficial effect." (Tr. 70) Plaintiff testified that he tried other things to help his pain such as a TENS unit, "something . . . beneath [his] lower knee that charge[d] electrical pulses into a certain spot on the knee that helped block the pain," and a prescription back brace to help him sit at the table. (Tr. 71). Plaintiff also stated that he had been going to a chiropractor and seeing a massage therapist who worked on his shoulders. (Tr. 71).

### b.    Testimony of Larry Higgins, Plaintiff's Father

Plaintiff's father Larry Higgins testified at the January 2016 hearing. (Tr. 84–92). Higgins testified that he had lived with Plaintiff. (Tr. 84). Higgins testified that Plaintiff spoke softly and

appeared sleepy because he was on a significant amount of medication and this was typical for

Plaintiff through the course of his day at home. (Tr. 85). Higgins testified that Plaintiff could not

sit or stand for long periods of time without having to lie down and that Plaintiff was "not alert"

and "in a stupor a lot." (Tr. 87). He also stated that Plaintiff was unable to cook or clean. (Tr.

87–88). Higgins testified that although Plaintiff tried to help out with laundry, he could only put

clothes into the machine and Plaintiff's mother had to do "all the folding and everything." (Tr.

88). Higgins acknowledged that Plaintiff was able to drive to his appointments but stated that

Plaintiff did not take his medications on those days and that Higgins would not ride with

Plaintiff in the driver's seat if his "life depended on it." (Tr. 87, 90). Higgins also testified that

Plaintiff usually did not wake up until around 1:00 to 2:00 in the afternoon, and that Plaintiff

was only awake for eight to nine hours of the day because Plaintiff's "medications just knock

him completely zonkers." (Tr. 88–89). Higgins testified that he continued to work in order to

take care of Plaintiff. (Tr. 89).

### c.      Vocational Expert Testimony

Vocational expert ("VE") Sugi Komarov testified at the 2016 hearing. (Tr. 72–81). The VE

testified that Plaintiff's prior work as a retail store manager and property manager were both

classified as skilled and light exertional jobs. (Tr. 74). Plaintiff's prior work as a swimming pool

maintenance worker was classified as a semi-skilled and medium exertional job. (Tr. 74–75).

The ALJ asked the VE to consider a hypothetical person with Plaintiff's vocational profile,

who could perform light exertional work with no more than occasional postural positions

(including climbing stairs, crouching, crawling, stooping, kneeling, and balancing), and who

could only perform simple, routine, and repetitive tasks. (Tr. 75). The VE testified that such a person would be precluded from any of Plaintiff's past relevant work, but could perform unskilled, light jobs, including mail clerk, office helper, and furniture rental clerk. (Tr. 76).

In a second hypothetical, the ALJ asked the VE to add an additional mental limitation, which would limit the hypothetical person described above to no more than occasional interaction with the general public. (Tr. 76). The VE testified that such a person could still work as a mail clerk or office helper, but would be unable able to work as a furniture rental clerk. (Tr. 76). The VE testified that such a person could also work as a housekeeping cleaner. (Tr. 76).

In a third hypothetical, the ALJ changed the exertional level from light to sedentary but otherwise kept the same limitations from the prior hypotheticals (no more than the occasional postural positions previously identified; simple, routine, repetitive tasks; and no more than occasional interaction with the general public). (Tr. 77). The VE testified that this third hypothetical person could work as an addresser, document preparer, and semiconductor bonder. (Tr. 77).

The ALJ's fourth hypothetical asked the VE to assume that due to various symptoms the hypothetical person described above was also going to be off task up to fifteen percent of the workday. (Tr. 78). The VE indicated that such a person would not be able to maintain employment. (Tr. 78). The VE also testified that a person who was going to be absent from work two or more days per month, and a person who was unable to consistently complete eight hours of cumulative sitting, standing, and walking would not be able to sustain employment. (Tr. 78).

### III.    Analysis

#### A.    Applicable legal principles

##### 1.    Standard of Review

A court's review of the Commissioner's final decision is limited to determining whether there is "substantial evidence" in the record as a whole to support the determination or whether it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam); *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008).[25] Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency." *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Burgess*, 537 F.3d at 128).

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. *Byam v. Barnhart*, 336 F.3d 172, 179 (2d Cir. 2003) (citing *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009). However, "where application of the correct legal principles to the record could lead to only one conclusion, there

---

[25] The standards that must be met to receive supplemental security income benefits under Title XVI of the Social Security Act are the same as the standards that must be met in order to receive DIB under Title II of the statute. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Accordingly, cases addressing either claim are equally applicable to the issues before the Court.

is no need to require agency reconsideration." *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir.

1987).

The Supreme Court has defined "substantial evidence" as "'more than a mere scintilla

[and] such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord Talavera*, 697 F.3d at 151.

Consequently, "[e]ven where the administrative record may also adequately support contrary

findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long

as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010)

(per curiam) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)). Thus, "[i]n

determining whether the agency's findings were supported by substantial evidence, 'the

reviewing court is required to examine the entire record, including contradictory evidence and

evidence from which conflicting inferences can be drawn.'" *Selian*, 708 F.3d at 417 (citation

omitted).

### 2. Determination of Disability

A person is considered disabled for Social Security benefits purposes when he is unable

"to engage in any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."42 U.S.C. § 423(d)(1)(A);

*see also Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability

to work must last twelve months). In addition, to obtain DIB, the claimant must have become

disabled before the date on which he was last insured. *See* 42 U.S.C. §§ 416(i), 423(a); 20 C.F.R.

§§ 404.130, 404.315; *McKinstry v. Astrue*, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order) (citing *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 423(d)(2)(A).

In determining whether an individual is disabled for disability benefit purposes, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (internal quotation marks omitted)).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 404.1520(a)(4)(i)—(v); *see Selian*, 708 F.3d at 417-18; *Talavera*, 697 F.3d at 151. The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment." 20 C.F.R. § 404.1520(a)(4)(ii). If he does, the inquiry at the third step is whether any of these impairments meet one of the Listings in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). To be found disabled based on a Listing, the

claimant's medically determinable impairment must satisfy all of the criteria of the relevant Listing. 20 C.F.R. § 404.1525(c)(3); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Otts v. Comm'r of Soc. Sec.*, 249 F. App'x 887, 888 (2d Cir. 2007) (summary order). If the claimant meets a Listing, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the Listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If he cannot, then the fifth step requires assessment of whether, given claimant's RFC, he can make an adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If he cannot, he will be found disabled. 20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined as "the most [the claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), (quoting Social Security Ruling 96-8p, 1996 WL 374184, at *1 (July 2, 1996)). The results of this assessment determine the claimant's ability to perform the exertional demands[26] of sustained work which may be

---

[26]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). In contrast, non-exertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing,

categorized as sedentary, light, medium, heavy or very heavy. 20 C.F.R. § 404.1567; *see Schaal v. Apfel*, 134 F.3d 496, 501 n.6 (2d Cir. 1998). This ability may then be found to be limited further by non-exertional factors that restrict claimant's ability to work. *See Michaels v. Colvin*, 621 Fed. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove that the claimant's RFC allows the claimant to perform some work other than his past work. *Selian*, 708 F.3d at 418; *Burgess*, 537 F.3d at 128; *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), *amended in part on other grounds on reh'g*, 416 F.3d 101 (2d Cir. 2005).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. *Butts*, 388 F.3d at 383. "The [Medical-Vocational Guidelines] take[ ] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the [Medical-Vocational Guidelines] indicate[ ] whether the claimant can engage in any other substantial gainful work which exists in the national economy." *Pagan v. Colvin*, 15-CV-3117 (HBP), 2016 WL 5468331, at *9 (S.D.N.Y. Sept. 29, 2016) (quoting *Gray v. Chater*, 903 F. Supp. 293, 298 (N.D.N.Y. 1995) (internal quotation marks omitted; alterations in original)); *see Butts*, 388 F.3d at 383.

---

tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching. 20 C.F.R. § 404.1569a(c).

Exclusive reliance on the Medical-Vocational Guidelines is not appropriate where non-exertional limitations "significantly diminish [a claimant's] ability to work." *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986); *accord Butts*, 388 F.3d at 383 ("sole reliance on the [Medical Vocational Guidelines] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments that limit the range of sedentary work that the claimant can perform.") (citation omitted). "Significantly diminish" means an "additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." *Bapp*, 802 F.2d at 606; *accord Selian*, 708 F.3d at 421; *Zabala*, 595 F.3d at 411. When the ALJ finds that the non-exertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." *Butts*, 388 F.3d at 383-84 (internal quotation marks and citation omitted); *see also Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

### 3.     Treating Physician Rule

The "treating physician rule" is a series of regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be accorded a treating physician's opinion.[27] A

---

[27] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R.

treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2); *see also Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000); *Diaz v. Shalala*, 59 F.3d 307, 313 n.6 (2d Cir. 1995); *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Schisler*, 3 F.3d at 568; *Burris v. Chater*, 94-CV-8049 (SHS), 1996 WL 148345, at *4 n.3 (S.D.N.Y. Apr. 2, 1996). The Second Circuit has noted that it "'do[es] not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician[']s opinion.'" *Morgan v. Colvin*, 592 F. App'x 49, 50 (2d Cir. 2015) (summary order) (quoting *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004)); *accord Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).

Before an ALJ can give a treating physician's opinion less than controlling weight, the ALJ must consider various factors to determine the amount of weight the opinion should be given. These factors include: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (c) (2)—(6); *Schisler*, 3 F.3d at 567;

§§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); a*ccord Cortese v. Comm'r of Social Sec.*, 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

*Mitchell v. Astrue*, 07-CV-285 (JSR), 2009 WL 3096717, at *16 (S.D.N.Y. Sept. 28, 2009); *Matovic v. Chater*, 94-CV-2296 (LMM), 1996 WL 11791, at *4 (S.D.N.Y. Jan. 12, 1996). Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor. *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted. *See Halloran*, 362 F.3d at 32-33; *see also Atwater*, 512 F. App'x at 70; *Petrie v. Astrue*, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); *Kennedy v. Astrue*, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order). "The opinions of examining physicians are not controlling if they are contradicted by substantial evidence, be that conflicting medical evidence or other evidence in the record." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016) (summary order) (citation omitted); *see also Monroe v. Comm'r of Social Sec.*, 676 F. App'x 5, 7 (2d Cir. 2017) (summary order). The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a treating physician's determination to this effect where it is contradicted by the medical record. *See Wells v. Comm'r of Soc. Sec.*, 338 F. App'x 64, 66 (2d Cir. 2009) (summary order). The ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record. *See Richardson*, 402 U.S. at 410; *Camille v. Colvin*, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995); *Mongeur*, 722 F.2d at 1039.

**B.      The ALJ's Decision**

The ALJ applied the five-step analysis described above and determined that Plaintiff was not disabled. (Tr. 18–30).

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2016. (Tr. 20).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of December 17, 2011. (Tr. 20).

At step two, the ALJ found that Plaintiff suffered from the following severe impairments: degenerative disc disease of the cervical, thoracic, and lumbar spine, obesity, chronic pain syndrome, hepatitis C, hypertension, and a history of opioid dependence. (Tr. 21). The ALJ found that Plaintiff's alleged impairments due to lupus, fibromyalgia, and asthma were not medically determinable impairments due to lack of objective evidence and stated that "[m]edical tests and objective findings are negative for rheumatoid arthritis, lupus, and fibromyalgia" and that "[t]he medical evidence does not include any signs, symptoms, or laboratory findings indicating that the claimant suffers from fibromyalgia or lupus." (Tr. 21).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 22-23). In reaching his conclusion, the ALJ stated that he gave specific consideration to section 1.00 of the listed impairments (Musculoskeletal System). (Tr. 22). The ALJ stated that although the record indicates that Plaintiff had a history of opioid dependence, depression, and panic

disorder, the severity of Plaintiff's mental impairments do not meet or medically equal the criteria of Listings 12.04, 12.06, and 12.09 for mental disorders. (Tr. 22–23).

The ALJ then determined that Plaintiff retained the RFC to perform light work[28] "except with no more than occasional postural positions (climbing stairs, crouching, crawling, stooping, kneeling, balancing) and being limited to simple routine and repetitive tasks." (Tr. 24).

To reach his RFC determination, the ALJ examined Plaintiff's symptoms and the extent to which his symptoms were reasonably consistent with the objective medical evidence and other evidence. (Tr. 24). The ALJ also considered the opinions of the treating and consulting physicians. (Tr. 24–28). The ALJ gave "little weight" to Dr. Boukhris's opinion because although Dr. Boukhris was a treating physician, she was not a specialist, and her opinion that Plaintiff was unable to maintain a full time job due to his multiple medical problems and pain, which would constantly interfere with his attention and concentration, was inconsistent with the objective findings as well as her own observations. (Tr. 26–27). Further, the ALJ found that Dr. Boukhris's opinion that Plaintiff could not walk or stand "for long" was not supported by objective signs or

---

[28] The regulations define "light work" as that work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities

20 C.F.R. § 404.1567(b). "Since frequent lifting or carrying requires being on one's feet up to two-thirds of the workday, the full range of light work requires standing or walking, off and on, for a total of 6 hours of an 8-hour workday." Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (1983).

findings. (Tr. 27). The ALJ also stated he was unable to give Dr. Boukhris's multiple opinions that Plaintiff was "disabled" controlling weight because that was an issue reserved for the Commissioner. (Tr. 26).

The ALJ gave "very little weight" to Dr. Dyer's opinion that Plaintiff could not stand or walk for an extended period or use a computer due to his symptoms because there were "no objective findings supporting this conclusion, except for intermittent swelling of the hands." (Tr. 27). Further, the ALJ stated that Dr. Dyer's opinion that Plaintiff was "disabled" was an opinion reserved to the Commissioner. (Tr. 27).

The ALJ found that Dr. Cho's opinion that Plaintiff was disabled based on a one-time examination was reserved for the Commissioner and was contradicted by the doctor's examination findings. (Tr. 27–28).

The ALJ gave "great" weight to consultative psychological examiner Dr. Leslie Helprin's opinion and summarized that opinion as follows:

> In Dr. Helprin's opinion, the claimant is able to follow and understand simple directions and instructions, perform simple rote tasks and complex tasks independently, maintain attention and concentration, maintain a regular schedule as it pertains to psychiatric and cognitive outlooks, make appropriate decisions, relate adequately with others whom he encounters, and is generally able to deal appropriately with is stressors.

(Tr. 28). The ALJ found that Dr. Helprin's opinion was consistent with the record, the findings on the mental status examination, and Plaintiff's intermittent psychological treatment. (Tr. 28).

The ALJ also considered Plaintiff's testimony and found that while Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, a

review of the entire case record showed that Plaintiff's testimony regarding the their intensity, persistence, and limiting effects were not entirely credible. (Tr. 26). The ALJ pointed out that Plaintiff's description of his daily activities to Dr. Helprin – that he could dress, bathe, groom himself, cook and prepare food, and sweep and wipe the counters, and that indicated that he went out to eat, bowling, and to the movies – indicated that he was not as limited as he claimed. (Tr. 25). The ALJ also found that Plaintiff's credibility was undermined by the fact that he had only pursued "conservative treatment," stating that "except for chronic medication use, the claimant has received only minimal treatment to relieve his pain." (Tr. 25). The ALJ found that "normal" findings on neurological examinations and consultative records, MRIs showing mild findings, a nerve conduction study failing to reveal plexopathy, radiculopathy, or peripheral neuropathy, and "normal" brain MRIs and EEGs undermined Plaintiff's credibility. (Tr. 25–26). The ALJ stated that there was evidence of medication-seeking behavior that further undermined Plaintiff's credibility. (Tr. 26).

At step four, the ALJ concluded that Plaintiff was unable to perform his past work. (Tr. 28–29). At step five, relying on the testimony of the vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Plaintiff could perform, given his RFC, age, education, and work experience. (Tr. 29). The ALJ noted that the vocational expert testified that given Plaintiff's age, education, work experience, and RFC, Plaintiff could perform work as a mail clerk, which has 102,000 jobs in the national economy, office helper, which has 88,000 jobs in the national economy, and a furniture rental clerk, which as 98,000 jobs in the national economy. (Tr. 29–30). Concluding the expert's testimony was consistent with the

information in the Dictionary of Occupational Titles, the ALJ determined that Plaintiff could perform those occupations and, accordingly, was not disabled. (Tr. 30).

### C.       Analysis of the ALJ's Decision

Plaintiff argues that remand is required because the ALJ failed to give controlling weight to the opinions of Plaintiff's treating physician, Dr. Boukhris, and that, therefore, the ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence. Defendant argues that the Commissioner's decision is supported by substantial evidence.

#### 1.       Treating Physician Rule

Remand is warranted because the ALJ misapplied the treating physician rule and, thus, Plaintiff's RFC is not supported by substantial evidence. The ALJ gave "little weight" to Dr. Boukhris's opinions, stating:

> Dr. Boukhris opined that the claimant could sit, stand and walk up to one hour in an eight-hour day, could occasionally lift and carry up to ten pounds, had limitations in reaching, handling, fingering and feeling, and had moderate limitation in [grasping], fine manipulation, and using his arms. She further opined that the claimant's pain would constantly interfere with his attention and concentration, that he was incapable of even a "low stress" job, that he would need to take unscheduled breaks and that he would likely be absent from work more than three times per month (Exhibit 18F). Dr. Boukhris additionally opined that the claimant was unable to maintain a full time job due to his multiple medical problems including depression and short-term memory loss (Exhibit 22F). The undersigned gives these opinions little weight. Although Dr. Boukhris is a treating physician, she is not a specialist, and her opinion is inconsistent with the objective findings as well as her own observations that the claimant had "very vague" symptoms and that there were significant differences between the claimant's allegations and the objective findings. Further, the opinion that the claimant cannot stand or walk for long is not supported by objective signs or findings (Exhibit 22F and 29F). In fact, Dr. Boukhris reported on October 23, 2012 that the claimant tested negative for point pain and pressure for fibromyalgia, which is inconsistent with her diagnosis (Exhibit 18F).

47

(Tr. 26–27). Further, the ALJ concluded that Plaintiff could do light work "except with no more than occasional postural positions (climbing stairs, crouching, crawling, stooping, kneeling, balancing) and being limited to simple routine and repetitive tasks." (22-24). Light work requires standing or walking, off and on, for a total of 6 hours of an 8-hour workday and involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 404.1567(b); SSR 83-10, 1983 WL 31251, at *6 (1983). The ALJ's analysis of the treating physician rule is flawed because, contrary to the ALJ's findings, Dr. Boukhris's opinions regarding Plaintiff's ability to walk, stand, lift and carry during the workday *are* supported by the objective medical record, and are consistent with the opinions of Plaintiff's other treating and consulting physicians. Moreover, the ALJ has failed to cite to any medical opinion that concluded that Plaintiff could do light work.

> a. **The ALJ Misapplied the Treating Physician Rule in the Assessment of Plaintiff's Ability to Stand and Walk**

Contrary to the ALJ's finding, there is evidence in the record that supports Dr. Boukhris's opinion that Plaintiff is unable to stand and walk for more than one hour in an eight-hour workday. As the ALJ recognized, Plaintiff suffers from degenerative disc disease of the cervical, thoracic, and lumbar spine as well as chronic pain syndrome and obesity. (Tr. 21, 25).[29] Objective evidence in the form of MRIs and x-rays, as well as

---

[29] As noted above, degenerative disc disease is associated with aching pain in the back or neck and may make everyday movements difficult. "Degenerative Disc Disease in Adults," *available at* http://nyulangone.org/conditions/degenerative-disc-disease-in-adults (last visited Nov. 28,

treatment notes by Dr. Boukhris and other physicians who examined Plaintiff, support Dr. Boukhris's assessment of Plaintiff's limited ability to stand and walk during a workday.

As an initial matter, the objective evidence in the form of MRIs and x-rays of Plaintiff's lumbar and cervical spine from 2010, 2012, 2013, 2014, and 2015 provided clinical support for Dr. Boukhris's conclusions regarding Plaintiff's limited ability to stand and walk. (567–68, 702-03, 731-32, 769–75). For example, a 2012 MRI of Plaintiff's lumbar spine showed that there was a generalized bulge and dorsal annual tear with narrowing of the left lateral recess. A 2015 x-ray of Plaintiff's lumbar spine showed that there was scoliotic curvature, diffuse disc space narrowing, osteophytosis, and retrolisthesis at the L4-L5 levels. (*see e.g.,* Tr. 567, 775). MRI results for Plaintiff's cervical spine also showed that there was disc bulging and foraminal stenosis in the cervical spine in 2010 at C5-C6 which progressed to "severe foraminal stenosis bilaterally" at the C5-C6 level in July 2015. (*See e.g.,* Tr. 569, 770). Moreover, a diagnostic study performed at Dr. Dyer's request indicated a positive result for potential "mixed connective tissue disease" and lupus. (Tr. 776). Thus, the ALJ's conclusion that Dr. Boukhris's opinion "is not supported by objective signs or findings" is inaccurate. (Tr. 26-27).

---

2018); *see also* Cedars-Sinai, "Degenerative Disc Disease," https://www.cedars-sinai.org/health-library/diseases-and-conditions/d/degenerative-disc-disease.html (last visited Nov. 28, 2018).

Further, Dr. Boukhris's treatment notes support her opinions in this regard. Dr. Boukhris found on several occasions that Plaintiff had decreased range of motion or pain in his extremities. (*See, e.g.* Tr. 622-26, 633, 637, 641). For example, in November 2012, Dr. Boukhris found that Plaintiff had pain in flexion of his lower back and noted that his MRI showed that he had a lumbar disc bulge and tear as well as stenosis of the cervical spine. (Tr. 637). Again, in December 2012, Dr. Boukhris found that Plaintiff had pain in all extremities, stiffness and decreased range of motion in his hands and decreased sensitivity in his legs. (Tr. 633). In March of 2013, Dr. Boukhris found that Plaintiff had pain on extension and flexion of his legs and prescribed a back brace. (Tr. 626). In June 2013, Dr. Boukhris noted that Plaintiff had decreased muscle strength in all extremities. (Tr. 624). Dr. Boukhris stated in a September 2013 letter that Plaintiff had difficulty walking and standing "for long periods" due in part to "chronic back pain." (Tr. 678). Again, in December 2013, Dr. Boukhris stated that, due to "chronic pain" and "degenerative joint disease of the cervical and lumbar spine with chronic lower and upper extremity radiculopathy," Plaintiff was unable to maintain "any postures for a long period of time." (Tr. 715). Dr. Boukhris also noted that Plaintiff was being "followed by a neurologist" for these conditions. (Tr. 715).[30]

---

[30] The ALJ is correct that Dr. Boukhris noted that there was a "big difference" between Plaintiff's reported symptoms and certain clinical findings. (Tr. 597–99). Dr. Boukhris at first stated that the disparity "could also be fibromyalgia," but ultimately found that Plaintiff had negative point pain for fibromyalgia. (Tr. 597). However, Dr. Boukhris explained that Plaintiff had positive clinical findings in other areas. In fact, she noted that there were "positive articular findings" and that "MRI findings support back pain and decrease in range of motion."

The assessments by Plaintiff's other physicians also support Dr. Boukhris's opinion regarding Plaintiff's limitations in standing and walking. Dr. Vigna examined Plaintiff on January 4, 2012, and found that he had tenderness in his lumbosacral spine and decreased range of motion in his right shoulder. (Tr. 682-83). Consulting examiner Dr. Alvarez also found in September 2012 that Plaintiff had decreased range of motion in his lumbar and cervical spine and that he had trigger points in the bilateral trapezius and gluteal areas. (Tr. 511-12). Although Dr. Cho's and Nasir's physical examination findings were unremarkable, both diagnosed Plaintiff with conditions that are consistent with Dr. Boukhris's conclusions.  In November 2013, Dr. Cho, a neurosurgeon, examined Plaintiff and reviewed the MRI of Plaintiff's lumbar spine and diagnosed Plaintiff with degeneration of the cervical and lumbar spine. (Tr. 700). Dr. Nasir, a neurologist, also reviewed Plaintiff's MRI results in 2014, noting that Plaintiff's "[l]umbar disc disease is unchanged since 2012" and diagnosed Plaintiff with chronic pain syndrome and prescribed medication to treat his pain. (Tr. 735-41). In a letter dated January 14, 2016, Dr. Dyer noted that Plaintiff had persistent and disabling back pain and "MRI imaging shows spondylolisthesis and lumbar disk disease at several levels" which, she concluded, limited his ability to stand or walk for any prolonged time. (Tr. 866). Dr. Dyer also noted that Plaintiff could walk for only short periods due to constant pain from his chronic plantar fasciitis. (Tr. 866). These objective findings and clinical assessments support Dr. Boukhris's opinion regarding Plaintiff's physical limitations in standing and walking due to lumbar pain.

---

(Tr. 561). Thus, although Dr. Boukhris noted that Plaintiff had some pain that was not explained by the objective findings, her opinion as to Plaintiff's limitations was based on the objective reports and her own examination findings.

### b. The ALJ Misapplied the Treating Physician Rule in the Assessment of Plaintiff's Ability to Use His Hands

In addition, the ALJ failed to justify giving "little weight" to Dr. Boukhris's opinion that Plaintiff "could occasionally lift and carry up to ten pounds, had limitations in reaching, handling, fingering and feeling, and had moderate limitations in [grasping,] fine manipulation, and using his arms." (Tr. 27, 600–01). The ALJ gives Dr. Boukhris's opinions "little weight" because he found that they are "inconsistent with the objective findings." (Tr. 27). However, contrary to the ALJ's conclusion, objective findings in MRI and x-ray reports as well as treatment notes by the examining doctors supported Dr. Boukhris's medical opinion regarding Plaintiff's physical limitations in using his upper extremities.

The ALJ's conclusion that there were *no* objective findings to support *any* limitations in Plaintiff's use of his arms and hands is erroneous. In 2010, an MRI result for Plaintiff's cervical spine showed that there was disc bulging and foraminal stenosis in the cervical spine at C5-C6. (Tr. 569). A 2012 MRI of Plaintiff's cervical spine showed disc bulging and foraminal stenosis at C5-C6 and stenosis at C6-C7, which progressed to "severe foraminal stenosis bilaterally" at the C5-C6 level in July 2015. (Tr. 769-72). Consistent with these objective reports, in a letter dated January 14, 2016, Dr. Dyer concluded that Plaintiff "has been shown to have severe foraminal stenosis of the cervical spine on MRI which causes constant shoulder pain and decreased function of his hands," and noted that due to this, Plaintiff was unable to use a computer or phone for any more than a short amount of time. (Tr. 866).

52

Dr. Boukhris's and Dr. Dyer's conclusions were supported by physical examination findings. In treatment notes from August 10, 2012, September 21, 2012, February 28, 2013, March 26, 2013 and May 17, 2013, Dr. Boukhris noted that Plaintiff had swelling, tingling or pain in his hands. (Tr. 559, 625, 626, 630, 639, 642-43). Rheumatologist Dr. Antar examined Plaintiff on September 21, 2012, and also observed that both of Plaintiff's hands were swollen and that he had tenderness in his wrists. (Tr. 542). Additionally, in a consultative examination on September 4, 2012, Dr. Alvarez noted that Plaintiff had "redness and swelling of dorsal aspects of both hands secondary to lupus." (Tr. 512). Although Dr. Alvarez found that Plaintiff had full grip strength bilaterally, he recognized that he had decreased range of motion in the cervical and lumbar spine, had trigger points, and opined that Plaintiff had "mild to moderate restrictions" for lifting and carrying. (Tr. 512-13). These medical findings and assessments support, and do not contradict, Dr. Boukhris's opinion that Plaintiff had limitations in the use of his hands and arms and that he could not lift more than ten pounds occasionally. (Tr. 746-47). More importantly, they contradict the ALJ's failure to include *any* limitations in grasping, fine manipulation and use of his arms in the assessment of Plaintiff's RFC.

The ALJ's misapplication of the treating physician rule was not harmless because Dr. Boukhris's assessment of Plaintiff's limited ability to stand and walk as well as lift and carry items over ten pounds during a workday would have changed Plaintiff's RFC. Thus, remand is necessary for reconsideration of Plaintiff's RFC.

### c. The ALJ Substituted His Own Opinion for a Competent Medical Opinion

Although the ALJ did not cite to any particular opinion in the record to support his RFC finding, the Commissioner argues that the ALJ's RFC assessment regarding Plaintiff's physical abilities is supported by the treatment notes and Dr. Alvarez's report. (Def. Mem. (ECF 19) at 24-25). As noted above, the objective findings and treatment notes were largely consistent with Dr. Boukhris's opinions. As to Dr. Alvarez, the ALJ did not explicitly state that he was relying on this opinion for any particular RFC finding or state what weight he gave to Dr. Alvarez's opinion. In any event, Dr. Alvarez is an internist and is neither an orthopedic specialist nor a specialist, and his opinions do not clearly support the ALJ's findings. (Tr. 27).

Even if the ALJ did rely on Dr. Alvarez's conclusions (which is not clear from the record), Dr. Alvarez's single examination occurred before Plaintiff's first hearing on October 4, 2013 and it is not clear what medical records, if any, he reviewed before preparing his report. Further, on May 12, 2015, the Appeals Council granted Plaintiff's request for review based on newly submitted evidence, and remanded the case to the ALJ to consider that evidence. (Tr. 146–49). Therefore, not only did Dr. Alvarez examine Plaintiff only one time, but he did not have Plaintiff's medical records after September 2012, which contained new evidence that would be relevant to the RFC assessment.

Moreover, in his one-time consultative examination of Plaintiff in September 2012, Dr. Alvarez did not assess Plaintiff's ability to sit, stand, walk or lift during a workday. Dr. Alvarez observed that Plaintiff had limited range of motion in his cervical and lumbar spine, had trigger points in his bilateral trapezius and gluteal areas, could only walk on his heels and toes

"partially," and had redness and swelling on his hands. (Tr. 511-12). Dr. Alvarez also found that Plaintiff could partially squat and walk on his heels and toes, had full strength in his upper and lower extremities, and that his hand and finger dexterity was intact. (Tr. 511–12). However, it is not possible to determine from these conflicting observations whether Plaintiff could do light work. *See Mariani v. Colvin*, 567 F. App'x 8, 10 (2d Cir. 2014) (summary order) ("Medical evidence at both ends of the spectrum, however, is not substantial evidence for a finding that the extent of the disability is fifty percent capacity."); *Ferraris v. Heckler*, 728 F.2d 582, 586–87 (2d Cir.1984) (holding that where there was no consensus among physicians' opinions, the ALJ should have set forth specific findings of exactly what the claimant could do, "especially with reference to his ability to sit and for how long"); *Morales v. Colvin*, 16-CV-0003 (WIG), 2017 WL 462626, at *2 (D. Conn. Feb. 3, 2017) ("[T]hese [treatment] notes do not (nor would one expect they should) reflect Plaintiff's limitations, particularly as to how her conditions, in combination, affect her ability to work on a sustained basis."); *Manchester v. Colvin*, 13-CV-00308, 2014 WL 4983496, at *5 (N.D.N.Y. Oct. 6, 2014) ("[A]lthough the ALJ's written decision includes a narrative discussion of the raw medical data contained in plaintiff's medical records, such information is not an acceptable basis for making an RFC finding in the absence of a supporting expert medical opinion.").

To the extent that the ALJ relied on Dr. Alvarez's opinion that Plaintiff had "mild to moderate" limitations in lifting and carrying to find that Plaintiff could do light work, (Tr. 27, 513), such assessments are too vague to constitute substantial evidence. The use of the terms "mild" and "moderate" in this context provide little guidance on Plaintiff's limitations. *See*

*Selian*, 708 F.3d at 421 (ALJ's RFC determination not supported by substantial evidence when she relied on "remarkably vague" opinion of consulting physician; "[w]hat [the consulting physician] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The consulting physician's] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently." (citations omitted)); *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (medical opinions that claimant had "moderate" limitations for lifting and carrying and "mild" ones for standing, walking, pushing, pulling and sitting were too vague), *superseded by regulation on other grounds*, 20 C.F.R. 404.1560(c)(2); *accord Paz v. Commissioner of Soc. Sec.*, 14-CV-6885, 2016 WL 1306534, at *17 (E.D.N.Y. Mar. 31, 2016); *Hilsdorf v. Commissioner of Soc. Sec.*, 724 F. Supp. 2d 330, 347-48 (E.D.N.Y. 2010).

Indeed, although some doctors had mild examination findings on some days, there is no opinion in the record that Plaintiff could walk and stand for six out of eight hours in a workday, lift up to 20 pounds at a time, and frequently lift or carry up to 10 pounds as required by light work. By failing to cite to any medical opinion to support his conclusions, the ALJ improperly substituted his own lay opinion for a competent medical opinion as to the severity of Plaintiff's physical impairments. In *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998), the Court of Appeals held that the ALJ in that case "erred in rejecting the opinions of [plaintiff's treating] physicians solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings." The Court of Appeals further explained that

> [the Court] need not address whether the treating physicians' opinions bound the ALJ under § 404.1527(d)(2) because in this case the Commissioner failed to offer and the ALJ

did not cite *any* medical opinion to dispute the treating physicians' conclusions that [the plaintiff] could not perform sedentary work. In the absence of a medical opinion to support the ALJ's finding as to [the plaintiff's] ability to perform sedentary work, it is well-settled that "the ALJ cannot arbitrarily substitute his own judgment for [a] competent medical opinion. . . . [W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." *McBrayer v. Secretary of Health and Human Servs.*, 712 F.2d 795, 799 (2d Cir. 1983) (internal quotation marks and citations omitted); *see also Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

*Balsamo v. Chater*, 142 F.3d at 81 (emphasis and last three alterations in original); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) ("The ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion."); *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("In analyzing a treating physician's report, 'the ALJ cannot arbitrarily substitute his own judgment for [a] competent medical opinion.'" (citation omitted)); *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").[31]

---

[31] While, in some circumstances, an ALJ may make an RFC finding without opinion evidence, the RFC assessment will be sufficient only when the record is "clear" and contains "*some* useful assessment of the claimant's limitations from a medical source." *See Staggers v. Colvin*, 14-CV-717(JCH), 2015 WL 4751123, at *3 (D. Conn. Aug. 11, 2015) (emphasis in original); *see also Monroe v. Comm'r of Social Sec.*, 676 F. App'x 5, at *8 (2d Cir. 2017) (summary order) (when a record "contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity, a medical source statement or formal medical opinion is not necessarily required.") (internal quotation marks and citations omitted). Here, the ALJ failed to cite to such evidence. Indeed, the only treatment notes reflecting Plaintiff's ability to walk on a regular basis were statements that Plaintiff walked his dog for up to one hour a day, (Tr. 811-12), which is consistent with Dr. Boukhris's opinion.

Even if, as the ALJ contends, Dr. Boukhris's medical opinions (or those of the other

doctors who concur) are not supported by the record, the ALJ was required to seek

clarifications from Dr. Boukhris or other treating physicians, particularly the specialists that

examined him and reviewed his medical records, or to seek the opinion of a consulting medical

expert; he may not substitute his own medical opinion. *See Gavazzi v. Berryhill*, 687 F. App'x 98,

100 (2d Cir. 2017) (summary order) ("Although the record as it stands does not support a

decision to assign minimal or no weight to the opinions of [plaintiff's treating physician] on

these topics, the ALJ may further develop the record by, for example, arranging for the input of

another examining physician"); *Pagan v. Comm'r of Social Sec.*, 16-CV-3774 (ER)(HBP), 2017 WL

9565536, at *15 (S.D.N.Y. July 13, 2017) (remanding for review of factors relevant to treating

physician rule and possible development of medical evidence from creating physicians or an

independent medical expert), *report and recommendation adopted*, 2017 WL 4174815 (S.D.N.Y.

Sept. 20, 2017).[32]

### 2. Credibility and Plaintiff's Mental RFC

Plaintiff also argues that the ALJ's conclusions that Plaintiff is not fully credible and his

assessment of Plaintiff's mental limitations are not supported by substantial evidence. Because

---

[32] For example, although Dr. Boukhris and other doctors that examined Plaintiff diagnosed Plaintiff with lupus and fibromyalgia, (Tr. 512-13, 561, 597, 809), the ALJ found that these were not medically determinable impairments because they were not supported by "signs, symptoms, or laboratory findings. "(Tr. 21). The ALJ specifically discounted fibromyalgia because the medical evidence did not "confirm that the claimant has the requisite number of tender point findings (or any tender points)." (Tr. 21, citing SSR 12-2p, 2012 WL 3104869 (July 25, 2012)).  However, there is evidence that Dr. Alvarez did find trigger points. (Tr. 512). Further, at least one diagnostic report ordered by Dr. Dyer appears to support the lupus diagnosis. (Tr. 776).

the ALJ's errors in applying the treating physician rule and assessing Plaintiff's physical RFC warrant remand, I do not address whether the ALJ's conclusion regarding Plaintiff's mental RFC and credibility were supported by substantial evidence.[33] On remand, the ALJ should properly assess the treating physician rule and plaintiff's RFC in light of all of the evidence and the relevant factors, and should consider "the combined effect of [the] claimant's impairments," *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir.1995) and his conclusions "must be based on *all* of the relevant evidence in the case record," including "the effects of treatment . . . limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p, 1996 WL 374184, at *5 (July 2, 1996) (emphasis in original); *see also* 20 C.F.R. § 404.1529(c)(3)(iv).

_____

[33] I note that the ALJ gave little weight to Dr. Boukhris's opinion that Plaintiff suffered from depression and short term memory loss, (Tr. 27, 678), and that the ALJ supported his conclusion with consultative psychologist Leslie Helprin's findings from her one-time examination of Plaintiff in September 2012. (Tr. 28). However, Dr. Helprin rendered his opinion without reviewing the diagnostic testing conducted on December 21, 2012, which showed that Plaintiff's cognitive functioning was "below the normal range" for his education and that Plaintiff had a "marked" impairment in memory and a "probable impairment" in executive functioning. (Tr. 576).

**IV.    Conclusion**

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF 14) is

GRANTED, the Commissioner's cross-motion (ECF 18) is DENIED and the matter is remanded to

the Commissioner pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with this

opinion.

SO ORDERED.

_s/ Ona T. Wang_

Dated: November 28, 2018                                    **Ona T. Wang**
       New York, New York                          United States Magistrate Judge